FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 07 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X

GREGORY CLARKE,

      Petitioner,

-against-

CATHERINE COOK,

      Respondent.

----------------------------------------------------------------- X

10-CV-5846 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

On December 16, 2010, Gregory Clarke ("petitioner"), represented by counsel, filed a petition for a writ of habeas corpus challenging his criminal conviction pursuant to 28 U.S.C. § 2254. In his petition, he claims (1) that trial counsel's failure to move for a mistrial when grounds for a severance emerged during trial deprived him of effective assistance of counsel and (2) that the prosecutors' failure to inform his trial counsel of his codefendant's in camera court appearance deprived petitioner of due process and a fair trial. For the reasons stated below, petitioner's application is denied.

## BACKGROUND

Petitioner was arrested on February 14, 2003, when he and Desmond Tapper ("Tapper") arrived at the scene of his brother-in-law's homicide wearing bullet-proof vests and artificial shields identifying them as "US bail enforcement fugitive recovery special agent[s]." Pursuant to a search of petitioner's car, the police found a loaded .357 magnum firearm in a compartment under the passenger seat, where Tapper had been seated and a forged bank check in the car's trunk. Petitioner and Tapper agreed to go to the stationhouse, where Tapper told a detective that the gun recovered from the vehicle was his and that petitioner had not been aware of its presence

1

in the car. Petitioner and Tapper were jointly charged with criminal possession of a weapon in the second degree, two counts of criminal possession of a weapon in the third degree, criminal possession of a forged instrument in the second degree, and the unlawful wearing of a body vest.

At arraignment and throughout pre-trial proceedings, Tapper was represented by Alan Hirshman, whose legal fees were paid for by petitioner. Tapper and petitioner, represented by separate counsel, jointly moved for the suppression of physical evidence. At the suppression hearing, which spanned over three days from May to July 2004, Tapper again claimed responsibility for the gun. Namely, he testified that, after learning of the murder, he had retrieved the loaded gun from his home and concealed it under the passenger seat of the car. The suppression motion was denied. Subsequent attempts to reach a plea bargain were unsuccessful.

Several months later, in September and early November, Tapper contacted the District Attorney's Office asking for help. Tapper indicated that he did not trust Hirshman because petitioner had paid Hirshman's fees, and he said that Hirshman was trying to "trick" him. The prosecutor terminated the conversation each time that Tapper called and eventually brought the matter to the court's attention.

On November 8, 2004, the court held an in camera proceeding to address Tapper's conflict-of-interest allegations and the possibility of appointing shadow counsel. Appearing before the court outside the presence of prosecutors, Tapper said that it had been mistake to confess and to testify that the gun was his. He stated that petitioner was paying his legal bills, that he did not believe that Hirshman was representing his best interests, and that he thought Hirshman was working with petitioner's lawyer and telling him everything that Tapper planned to do. The court informed Tapper of his right to terminate his lawyer and to have other counsel appointed and instructed him to return the following morning to speak with a court-assigned

2

attorney about the situation. Showing the court what appears to have been a document from Hirshman, Tapper then interjected the following: "This is what he show me, sir, and I even—I, I took my citizenship tests, my citizen, and they deny me because of this case is going on." Pet., Ex D at 15. The court responded that the document was Mr. Hirshman's advice that Tapper would be deported if he were convicted of a felony and that such advice was "not necessarily inaccurate." Id. The court again advised Tapper of his right to counsel and ordered the record to remain sealed until further order of the court.

The following morning, the court held an in camera proceeding with the prosecutors in the case and Michael Hartofilis, the attorney whom the court had contacted to serve as shadow counsel. The court put on record the nature of the prior day's proceeding and noted that, at the court's direction, Hartofilis had spoken with Tapper and the Assistant District Attorneys. The court then adjourned the matter to allow Tapper to decide whether he wanted to change counsel. The record of this proceeding, like that held of day before, was placed under seal.

Tapper subsequently decided to change counsel, and the court appointed Hartofilis to represent him. On October 3, 2005, petitioner and Tapper jointly proceeded to trial. At trial, two detectives and one police officer testified about the details of the defendants' arrest and Tapper's initial statements to police. On the day of the defendants' arrest, police witnessed petitioner driving his black Mercedes around a police vehicle and under crime scene tape, at which point an officer motioned for him to stop the vehicle. In the car, police discovered a loaded gun in a compartment under the passenger's seat, a silver .357 bullet on the floor of the passenger's seat, a walkie-talkie tuned to the 105th Police Precinct frequency, and a forged check the trunk. One of the officers testified that, after traveling to the stationhouse, Tapper said he had taken the gun from his house, and Tapper's written statement to that effect was placed in evidence. In the

statement, Tapper said that he had retrieved the gun because petitioner had received "a lot of calls about people wanting to hurt him." Trial Tr. at 744-48. As part of the prosecution's case-in-chief, an expert in the field of forged bank instruments also testified that the forged check was clearly not genuine.

Tapper then presented his defense case. Tapper's mother testified that Tapper worked for petitioner and that they were like brothers. She said that, following petitioner's and Tapper's arrest, petitioner told her that the gun was his, that Tapper was going to "take [the] rap" for petitioner because Tapper's record was clean and the judge would throw the case out if they charged Tapper with it, and that petitioner would take care of Tapper. Id. 910-11.

Tapper also testified on his own behalf. He said that, at the time of his arrest, he had been the manager of petitioner's Laundromat and was also doing security work that required him to wear a bullet-proof vest and a shield. He testified that, after petitioner learned of his brother-in-law's murder, he and petitioner first went to the home of a person who had argued with petitioner's brother-in-law the night before and then to petitioner's apartment in Queens, where petitioner retrieved a gun. According to Tapper, petitioner put the gun in the glove compartment of the car. When they arrived at the crime scene, he and petitioner began speaking with family members and were approached by plainclothes detectives, who requested their identification. At the police's request, Tapper went to the stationhouse to verify his employment. While there, petitioner asked Tapper to say that the gun was his if the police discovered it because Tapper did not have a record but petitioner had a felony conviction and would go away for seven to fifteen years. Petitioner told Tapper he would pay for his lawyer and that they would throw it out of court. He also promised Tapper a barbershop and a car. During police questioning later that day, Tapper took responsibility for the gun in both oral and written statements.

Tapper testified that, at some point prior to the suppression hearing, he told Hirshman that he did not want to testify that the gun was his and wanted to approach the District Attorney's Office to explain what had happened. Tapper told his attorney that he was going to testify at the hearing that that gun was petitioner's, but he ultimately testified that the gun was his. However, after the hearing, he again told Hirshman that he wanted to meet with prosecutors to disclaim responsibility for the gun. He told his attorney that he thought the case would have been thrown out by then. After several months of waiting to meet with the District Attorney's Office, Tapper called the prosecutor himself. After Hartofilis was appointed to represent Tapper at trial, petitioner had two meetings with prosecutors.

Petitioner then presented his defense case, in which he testified as the sole witness. Petitioner acknowledged that he had previously been convicted of a felony. He testified that he owned a real estate investment company and did security work for a fugitive recovery company. Petitioner said that he told Tapper of his brother-in-law's death upon learning about it and that Tapper had asked petitioner to stop at Tapper's home. At Tapper's building, Tapper got out while petitioner remained in the car and talked on the phone. Tapper returned to the car, and they drove to the crime scene because petitioner was concerned that his niece may have been in the house when her father was killed. Petitioner denied asking Tapper to admit that he possessed the gun or telling Tapper's mother that Tapper had agreed to take the blame for possessing the gun. Petitioner testified that the gun was Tapper's and that he did not know it was in his car. He conceded that he knew there was a compartment underneath his passenger seat but maintained that he did not see Tapper place a gun there. Petitioner stated that he made the forged check found in his car while "experimenting" with new software and that he never intended to use it. Trial Tr. at 1072. Petitioner testified that he had paid for Tapper's bail and his first attorney but

said that Tapper had chosen Hirshman to represent him.

In rebuttal, a police detective testified about statements Tapper made in proffer sessions on March 8 and April 12, 2008. During those sessions, Tapper had stated that he and petitioner were going to a work site in Long Island when petitioner learned that his brother-in-law had been killed. Tapper said that they first went to petitioner's house, where petitioner retrieved a gun and stated words to the effect of, "[w]hoever did this is going to pay," Trial Tr. at 1180, and then went to Canarsie Brooklyn, where petitioner believed that his brother-in-law's murderer lived. They drove around for a while before proceeding to the crime scene.

On October 3, 2005, the jury found petitioner guilty of the four counts charged. They found Tapper guilty of one count of criminal possession of a weapon in the third degree and one count of the unlawful wearing of a body vest and acquitted him of the remaining charges. Petitioner was sentenced to concurrent terms of seven years' imprisonment on the second-degree weapons count, two-to-four years' imprisonment on the two third-degree weapons counts and the forged instrument count, and one-and-one-half-to-three years' imprisonment on the body vest count. Tapper received an aggregate determinate prison sentence of three years.

Petitioner appealed his conviction on the grounds, inter alia, that he was denied the effective assistance of trial counsel due to counsel's failure to move for severance. During Tapper's appeal of his case, the in camera proceedings regarding his conflict-of-interest allegations were unsealed, and petitioner was provided transcripts of them. Petitioner was granted leave to file a post-argument submission concerning the issue of their recent disclosure, and he thereafter moved to vacate his conviction on the ground that the prosecutor's non-disclosure of the transcripts deprived him of due process and a fair trial in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963).

In a decision dated July 7, 2009, the Appellate Division unanimously affirmed petitioner's conviction. People v. Clarke, 64 A.D.3d 612 (N.Y. 2d Dept. 2009). With regard to his ineffective assistance of counsel claims, the court succinctly stated, "[u]pon viewing the record as a whole, we conclude that the defendant was not denied the effective assistance of counsel." Id. at 614. It denied his Brady claims on the merits, finding that the in camera statements of his codefendant were inculpatory; did not concern the credibility of a prosecution witness; and were not within the prosecution's possession, custody, and control. Id. at 613 (citations omitted). In a certificate dated November 5, 2009, the Court of Appeals denied leave to appeal. People v. Clarke, 13 N.Y.3d 859 (2009). Petitioner's conviction became final ninety days later, and he filed the instant petition on December 16, 2010.

## DISCUSSION

Petitioner argues that he is entitled to relief on two separate grounds. He contends, first, that he was denied the effective assistance of counsel when trial counsel failed to move for a mistrial after Tapper's testimony provided grounds for severance. Second, petitioner argues that the prosecution's failure to inform defense counsel of Tapper's appearance before the court, during which he made statements that could have impeached his testimony, deprived him of due process and a fair trial. Respondent asserts that petitioner's claims are only partially exhausted and should be deemed exhausted and procedurally barred. Because the petition may be properly denied on the merits, the court need not address respondent's arguments in this regard. See Rhines v. Webber, 544 U.S. 269, 277 (2005); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

I.  **Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

## II. Petitioner's Ineffective Assistance of Counsel Claim

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated. See Harrington, 131 S. Ct. at 780. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 698. A court need not decide both prongs of the Strickland test if a there is an insufficient showing on one. See Id. at 697. In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). In order to prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Harrington, 131 S. Ct. at 785. Stated differently, the court may afford

habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or, if it did, that petitioner was not prejudiced as a result. See id.

Here, petitioner fails to show that his counsel's performance fell below an objective standard of reasonableness. Petitioner argues that his trial counsel's performance did not meet constitutional muster because he did not move for a mistrial on severance grounds when he learned that Tapper's defense was in irreconcilable conflict with petitioner's. He contends that such irreconcilable conflict entitled him to a mistrial under New York law, that any reasonably competent attorney would have moved for one, and that he was prejudiced as a result of his attorney's failure to do so. Petitioner reasons that, had he been tried separately from Tapper, Tapper would not have testified absent a deal, which petitioner could have used to impeach him. Moreover, petitioner would not have been compelled to testify had Tapper not taken the stand, and the prosecution's evidence would have been reduced to the mere presence of a gun in petitioner's car. Petitioner argues that this alternative strategy would have been "substantially more effective" than the course undertaken by petitioner's trial counsel. Pet'r's Reply at 5. Petitioner's arguments are unavailing.

In the circumstances of this case, the court cannot conclude that counsel's performance fell outside the wide range of professionally competent assistance. Counsel's decision not to move for a mistrial may be seen as part of a reasonable and sound trial strategy because the joint trial enabled counsel to argue, thanks to the admission of Tapper's prior statements and testimony, that Tapper exclusively possessed the gun without petitioner's knowledge. Resp't's Br. at 38. New York law provides that "[t]he presence in an automobile . . . of any firearm . . . is presumptive evidence of its possession by all persons occupying such automobile at the time

such weapon . . . is found." N.Y. Penal Law § 265.15(3); see People v. Maye, 64 A.D.3d 795 (N.Y. 2d Dept. 2009). As respondent correctly argues, had petitioner's counsel successfully sought a mistrial, Tapper's statements exculpating petitioner would likely have been inadmissible in his separate trial, "thereby leaving counsel with no evidence to rebut the presumption that petitioner possessed the gun by virtue of its presence in petitioner's car." Id. at 39. As such, petitioner's assertion that moving for a mistrial had no drawbacks is unavailing. That the strategy that petitioner's counsel chose to pursue proved unsuccessful does not mean that counsel was ineffective in electing to employ it. Nor does identifying an alternative strategy that, in hindsight, appears to have been a preferable course of action "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

This conclusion is bolstered by virtue of the fact that this case comes before the court on habeas review. Petitioner argues that the state court decision was contrary to and an unreasonable application of clearly established federal law because the decision did not specify the portion of Strickland upon which it based its analysis and otherwise cited to New York law, whose standard varies from the federal one and has, at times, been said to be in tension with it. As such, petitioner contends, "one can have no confidence that the court was correctly applying the federal test." Pet'r's Br. at 15. Asserting a lack of confidence in the state court's application of the federal standard falls well short of meeting petitioner's heavy burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. Contrary to the suggestion of petitioner's argument, this burden is not lessened where the state court gives minimal reasons for its decision or does not explicitly review counsel's representation under the federal standard. See id. at 785; Rosario v. Ercole, 601 F.3d 118, 128

(2d Cir. 2010) ("While [the court] did not explicitly review the evidence under the Strickland standard, the import was the same. Conflating the two prongs of Strickland does not violate AEDPA—different is not per se unreasonable."). "A state court 'unreasonably applies' clearly established law when it identifies the correct legal principle from Supreme Court jurisprudence, but unreasonably applies the principle to the case before it." Rosario, 601 F.3d at 126 (quoting Williams, 529 U.S. at 412-13). Here, the state court clearly identified the correct legal principal and even cited to Strickland. For the reasons stated above, the state court's application of the standard in this case was imminently reasonable, and petitioner's claim to the contrary is properly rejected.

Because the court finds that petitioner is not entitled to habeas relief pursuant to its analysis of the first prong of Strickland, there is no need to address the parties' arguments relating to the test's second prong.

### III. Petitioner's Brady Claim

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Moore v. Illinois, 408 U.S. 786, 794-95 (1972). Petitioner argues that the prosecutors' failure to inform defense counsel of Tapper's appearance before a judge violated Brady and deprived him of due process and a fair trial. In this regard, he contends that Tapper's in camera statement to the court about the case's effect on his citizenship tests could have been used to impeach Tapper because they "provide[d] a convincing explanation for him to lie about his guilt of possession of a weapon," namely the fear of being deported. Pet'r's Br. at 22. Petitioner argues that the prosecution "was

effectively in control of th[is] exculpatory evidence" because it had knowledge that in camera proceedings occurred. Id. at 25. According to petitioner, there is a reasonable probability that the case would have concluded differently had the transcripts been disclosed earlier and exploited during Tapper's cross-examination.

Making the generous assumption that such statements could be viewed as impeaching, a point on which the parties disagree and the state court did not express a view,[1] the state court's determination that Brady was not violated was nonetheless objectively reasonable. Petitioner fails to show that the supposed impeachment material was suppressed by the prosecution. The prosecutors were not privy to the court's in camera conversations with Tapper, and the state court reasonably found that his statements were not within the prosecution's possession, custody, and control. Petitioner's suggestion that the Assistant District Attorneys had reason to believe that Tapper's in camera discussion would reveal exculpatory or impeaching evidence is supported by nothing but post-hoc speculation. As such, there is no basis for concluding that the State suppressed those statements, either willfully or inadvertently. The state court decision must also be upheld on the separate ground that petitioner cannot establish prejudice. "Suppressed evidence is not material when it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" United States v. Amiel, 95 F.3d 135, 145 (2d Cir. 1996) (quoting United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (internal quotations omitted)). Tapper's credibility was thoroughly impeached at trial when he was confronted with his prior contradictory statements to police and his sworn testimony about the gun. Because his credibility had already been placed in significant doubt, and any cross-examination into his vague statement about possible deportation would have been

---

[1] The state court found the statements to be inculptatory but did not express any opinion as to their impeachment value.

cumulative.

## CONCLUSION

The petition for a writ of habeas corpus is denied. Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. In addition, this court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-445 (1962). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

S/Judge Ross
_____
Allyne R. Ross
United States District Judge

Dated: July 26, 2012
Brooklyn, New York